UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEL MAR TIC I, LLC and DEL MAR TIC II, LLC, <br><br>                     Plaintiffs, <br><br>      v. <br><br> THE BANCORP BANK, <br><br>                   Defendant. | Case No. 1:23-CV-08999-JLR <br><br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT** |

In this case, Bancorp continues to take unfair advantage of commercial terms negotiated under significantly different circumstances and use unprecedented and unforeseeable changes in the insurance market to force-place insurance coverage—likely to benefit a favored insurer—while shifting the costs onto Plaintiffs and frustrating the fundamental purpose of a loan agreement between the parties under which Bancorp loaned funds to Plaintiffs (the "Loan Agreement"). In doing so, Bancorp refused all reasonable alternatives Plaintiffs provided and insisted on enforcing a force-placed coverage that it knew it did not need to protect its interest in the loan. To date, Bancorp continues to refuse to give basic policy information to the Del Mar entities, including *who* the policy covers, *what* the policy covers, and *why* the policy premiums are nice, round numbers. Compounding its bad faith conduct, Bancorp took money from Plaintiffs' Escrow Account to pay for that force-placed coverage without permission and without authorization under the terms of the Loan Agreement. Plaintiffs bring this suit to bring Bancorp's misconduct to a stop, recover the Escrow Funds, and declare their rights under the terms of the Loan Agreement.

Plaintiffs Del Mar TIC I, LLC and Del Mar TIC II, LLC (collectively, "Plaintiffs") file this Complaint against Defendant The Bancorp Bank ("Bancorp") and allege, based on their own

personal knowledge with respect to their own actions and based upon information and belief with respect to all others' actions, as follows:

## PARTIES

1.     Plaintiff Del Mar TIC I, LLC is a Delaware limited liability company with a principal place of business in the State of Texas. None of its members are citizens of South Dakota.

2.     Plaintiff Del Mar TIC II, LLC is a Delaware limited liability company with a principal place of business in the State of Texas. None of its members are citizens of South Dakota.

3.     Defendant The Bancorp Bank is a South Dakota-chartered national association bank with a principal place of business at 3 Columbus Circle, Suite 2200, New York, New York 10019, and a registered agent at The Bancorp Bank, 1201 North Market Street, Wilmington, Delaware 19801.

## JURISDICTION & VENUE

4.     This Court has subject-matter jurisdiction in this action because there is complete diversity of citizenship between the parties and the amount-in-controversy exceeds $75,000. 28 U.S.C. § 1332(a).

5.     This Court has personal jurisdiction over Defendant because the Defendant has accepted service within the state of New York, Defendant has voluntarily appeared in this court, and Defendant's principal place of business is located in New York, New York. Further, Section 11.6 of the Loan Agreement specifies that this District is the appropriate forum for all disputes related to the Loan Agreement:

> **B.** **ANY LEGAL SUIT,** ACTION OR PROCEEDING **AGAINST LENDER** OR BORROWER **ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY** AT LENDER'S OPTION **BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW,** AND BORROWER WAIVES

6.    Venue is proper in this Court because Bancorp's principal place of business is located in this District and because this is the District in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391. Further, Defendant has agreed to this Court as the appropriate venue per the terms of the Loan Agreement, as set forth above.

## FACTS

### I.    The Loan Agreement

7.    On June 22, 2022, Plaintiffs entered into the Loan Agreement with Bancorp. The Loan Agreement designates Plaintiffs individually and collectively as the Borrower and Bancorp as the Lender. *See* Ex. 1.

8.    Section 2.1 of the Loan Agreement sets forth the General Loan Terms, including principal of up to $46,785,000 in the form of a $38,625,000 Initial Advance and a right to request Future Advances up to a maximum of $8,160,000. *Id.* § 2.1.

9.    The fundamental purpose of the Loan Agreement was to enable the purchase of real property—specifically, Del Mar Apartments, in Houston, Texas—using that real property and the rental proceeds therefrom to secure the loan, thus enabling Plaintiffs to run a profitable business by renting out the apartments and, over a prescribed period of time, repay the loan with interest. *See, e.g.*, Section 5.16 (titled "Leases" and attaching the "Rent Roll" as "Schedule 3" to the Loan Agreement).

10.    The Del Mar Apartments provide affordable, Class C housing to Houston residents. The Del Mar Apartments accept applications from "second chance" renters who may be unable to secure alternative housing due to poor credit history, evictions, and other problems that traditionally may prevent a renter's application from being approved. As Class C housing, Del Mar operates on a thin profit margin to ensure the property's ability to remain afloat and continued ability to house its residents.

11.    In a provision that is collateral to the fundamental purpose of the Loan Agreement, Plaintiffs agreed to procure and pay for property insurance coverage in an amount equal to full replacement cost. *See id.* § 8.1.1.

12.    Under the terms of the Loan Agreement, if Plaintiffs do not procure property coverage in the required amounts, Bancorp <u>may</u>—but is not required—force place coverage and require Plaintiffs to reimburse Bancorp for the cost of any such premiums. *Id.* § 8.1.2.

## II.    The Changing Insurance Market

13.    For the first year, from June 2022 through May 2023, Plaintiffs obtained property coverage from Landmark American Insurance Company as required by the Loan Agreement for a total premium of $630,474.

14.    From 2022 to 2023, there were drastic changes in the property insurance market. In addition to the current inflationary environment, reinsurance rates for property insurance carriers dramatically increased at the beginning of 2023 due to an unprecedented increase in the frequency and severity of natural disasters. As a result, the insurance market became highly illiquid and very few carriers, if any, were willing to provide all-risk property insurance at total replacement cost value at the levels contemplated by the Loan Agreement.

15.    In early 2023, prior to the expiration of the original policy, Plaintiffs made extensive efforts to identify a new carrier with a policy compliant with the terms of the Loan Agreement. Plaintiffs worked directly with two highly regarded brokers: (i) Gallagher, a global leader in insurance, risk management, and consulting services; and (ii) Higginbotham, an independent insurance brokerage firm that has provided businesses with insurance and risk management services since 1948.

16.    Through their brokers, Plaintiffs contacted numerous insurance carriers, including at least AmRisc, Arch, Arrowhead, Aspen, Axis, Beazley, Catalytic, CAN, CORE

Specialty/Starstone, Ethos, General Star, Hallmark, Intact, James River, Kinsale, Lexington, Lloyds of London, Munich Re, Navigators, Palomar, Paragon, Risk Smith, Rivington, RLI, RSUI, Seneca, Sompo/Endurance, Velocity, Ventus, Westfield, WKF&C, and Westchester.

17.    From all of these carriers, Plaintiffs were only able to obtain estimates for a premium that was *three times* the cost of the original policy—approximately $1.8 million for one year of coverage of the total replacement cost of the property. Not one carrier was ready to sign on the dotted line and bind a policy on Bancorp's demanded terms.

18.    This added expense would have frustrated the purpose of the Loan Agreement— insurance at this level of expense would eliminate any profit margin on the Del Mar property, and thus no money would be available to pay down the loan itself. These quotes fell well beyond increases contemplated by Plaintiffs and insurance experts. At the quoted rate, Plaintiffs' operating costs and debt servicing expenses exceed their revenue from the Del Mar Apartments.

### III.    Bancorp's Unreasonable Refusals to Agree to Lower Coverage Limits

19.    Recognizing the need to obtain insurance, but unable to do so at reasonable prices, Plaintiffs began engaging with insurance experts to identify the actual risk using two different models to do a Catastrophe Risk Assessment: The RMS RiskBrowser model and the AIR Touchstone model. RMS is the standard accepted risk modeling protocol that most lenders use.

20.    RMS determines catastrophic losses using complex software that simulates catastrophic events and determines losses from those events based on building characteristics. RMS runs a series of catastrophic events (both historical and simulated) against the building in question. Each event run has a probability associated with it so as to tell how likely that type of event is to occur in a given year. Losses are then determined on a per-event basis based on how the attributes of each event (wind speed, earthquake magnitude, etc.) would affect that type of building. The model uses actual engineering information gathered based on actual claim data. In

sum, RMS uses simulated and historical catastrophic events (hurricanes, earthquakes, etc.) to determine the actual exposure and vulnerability of a building to catastrophic losses. Taking that into account, RMS is able to generate an overall loss picture for a building.

21.    Similarly, AIR determines catastrophic events using complex software to simulate catastrophic events and determine losses from those events based on building characteristics. AIR also takes into account building characteristics and uses a combination of historical and simulated catastrophic events (hurricanes, earthquakes, etc.). AIR employs statistical methods to evaluate a Probable Maximum Loss (PML) for a given building in facing a particular type of catastrophic event and to generate a curve based on the probability of a given type of event (such as a 1-in-100 year event or a 1-in-1000 year event, etc.). AIR can also be used to calculate an Average Annual Loss, even if such loss is not expected to occur on an average annual basis. Taking all of these factors into account, AIR is able to generate an overall loss picture for a building.

22.    For 2023, the total insurable value of the Del Mar property is $63,040,898. The insurable value of the Del Mar Apartments is considerably higher than principal of the loan between the Del Mar entities and Bancorp due to the age of the property. Total replacement cost insurance values the insurable interest of a property at the level of what it would cost to rebuild the property *exactly the same way it was built*, including using outdated and costly building methods and materials. As the Del Mar Apartments is a large property built in 1978, it would be much cheaper to rebuild the property using modern building methods and materials should such construction be necessary.

23.    Using the RMS model, the Ground Up Loss and Gross Loss for a 1000-year windstorm event at the Del Mar property are projected to be $17,077,922—*nearly $46 million less than the total insurable value* (Ex. 2):

## RMS Windstorm

| Return Period | Ground Up Loss GU OEP | Deductible Loss CL OEP | Gross Loss GR OEP |
|---|---|---|---|
| 10,000 | 39,635,144 | -1 | 39,635,144 |
| 5,000 | 32,664,525 | -1 | 32,664,525 |
| 1,000 | 17,077,922 | -1 | 17,077,922 |
| 500 | 11,815,561 | -1 | 11,815,561 |
| 250 | 7,555,287 | -1 | 7,555,287 |
| 100 | 3,429,886 | -1 | 3,429,886 |
| 50 | 1,400,073 | -1 | 1,400,073 |
| 25 | 320,885 | -1 | 320,885 |
| 10 | 7,768 | -1 | 7,768 |
| 5 | 0 | -1 | 0 |
| AAL | 132,820 | -1 | 132,820 |
| SD | 1,196,057 | -1 | 1,196,057 |
| CV | 9 | -1 | 9 |

24.    In other words, a coverage policy for full replacement cost actually exceeds the expected risk on an annual basis by approximately $46 million in unnecessary, excess coverage. In essence, it would be over-insurance.

25.    When factoring in the 5% wind loss deductible ($3,152,045 on a total insurable value of $63,040,898), the actual insurance payout would be less than $14 million. Accordingly, a $15 million named windstorm limit per occurrence would be more than sufficient under the RMS modeling.

26.    In fact, the highest loss estimated by RMS is for a 10,000-year windstorm event, with Ground Up Loss and Gross Loss of $39,635,144—*still more than $23 million less than the coverage required by the Loan Agreement*.

27.    The AIR model demonstrated similar results:



28.    For other types of events, such as RMS and AIR Severe Storm modeling, the expected loss was even lower:





29.      Plaintiffs presented all of this information to Olek DeRowe at Bancorp, in an effort to convince Bancorp to agree to reduce the insurance requirements under the Loan Agreement. CBRE also communicated with DeRowe and Bancorp with this information in an effort to convince Bancorp to agree to a reduction.

30.      Mitchell Jennings, from Higginbotham, spoke directly with Bancorp and learned that Bancorp was making concessions on insurance limits to other borrowers because the insurance market had so abruptly and unpredictably shifted since the prior year.

31.      Despite knowing that Bancorp was making concessions to other clients because of this unprecedented insurance market, DeRowe continued to insist that Plaintiffs insure the Del Mar property up to the full replacement value. In other words, Bancorp unreasonably and in bad faith insisted that Plaintiffs carry _$46 million more than they actually needed_ to protect Bancorp's loan investment, and arbitrarily enforced this requirement on the Del Mar entities while negotiating with other borrowers.

32.      In fact, Bancorp insisted that Plaintiffs carry coverage to an extent that is _over $23 million more_ than the RMS model projects even for a 10,000-year windstorm event, and _nearly $20 million more_ than the total principal of Bancorp's loan.

33.     In light of Bancorp's willingness to make concessions for other borrowers, this insistence that Plaintiffs maintain full coverage amounts to deliberate, intentional, bad faith conduct designed to frustrate the fundamental purpose of the Loan Agreement.

34.     Even Bancorp's own insurance consultant, Ms. Kate Jensen from Pillar Risk, confirmed that Bancorp's insurance requirements were excessive and unreasonable. She spoke with DeRowe to try to convince Bancorp to accept a lower limit, but DeRowe—again, acting in deliberate bad faith—refused.

35.     Plaintiffs, through Higginbotham, tried to hone in on DeRowe's and Bancorp's concerns—they asked whether the concern was flooding, and Bancorp confirmed it was. So Plaintiffs offered to carry specific flood coverage to address that concern—DeRowe and Bancorp refused to accept.

36.     Again through Higginbotham, Plaintiffs asked what else Bancorp was concerned about; Bancorp stated they were worried about tornadoes. So Plaintiffs offered to put tornado coverage on the Del Mar property. Again, DeRowe and Bancorp refused to accept.

37.     All told, acting maliciously and in bad faith, DeRowe and Bancorp refused every possible alternative Plaintiffs offered to satisfy the insurance requirements under the Loan Agreement. While Plaintiffs continued to use their best efforts to listen to Bancorp's coverage needs and find coverage that would allow them to pay their insurance premiums while still being able to pay down the loan principal, Bancorp hid the ball and arbitrarily refused to come to the table.

## IV.    Bancorp's Unreasonable Force Placed Coverage

38.     Unfortunately, Bancorp's bad faith conduct did not end there. At DeRowe's direction, on June 23, 2023, Bancorp force placed insurance coverage on Del Mar without consulting Plaintiffs, and did so for an unreasonable, excessive, and unusually round price:

$250,000 in premium for the period from June 22, 2023 to July 31, 2023, and $193,000 per month thereafter:

> The premium amount for the lapse in coverage for 06/22/2023 to 07/31/2023 will be approximately $250,000. Effective with the 08/01/2023 remittance the monthly premium will be approximately $193,000.

39.    Remarkably, this equates to an annual premium over *2.3 million per year*, which is even more than the unreasonably expensive policies Plaintiffs had identified to Bancorp during negotiations over the insurance.

40.    Despite claiming to have force placed the coverage, DeRowe and Bancorp have refused to do any of the following, with DeRowe making the claim that the information is "proprietary":

- Identify the carrier;

- Identify the policy amounts and limits;

- Provide a policy number;

- Provide policy documentation;

- Provide claims contact information in the event of a loss;

- Provide details on what is, or is not, covered by the force-placed policy;

- Identify the deductible amount for different types of loss; or

- Provide any information at all that would allow Plaintiffs to evaluate the force-placed policy.

41.    In fact, even in force placing the coverage—which Bancorp insisted upon doing because it claimed it needed to be insured up to total replacement value—Bancorp admitted that the forced placed coverage "may not equal the replacement cost of the property":

> Due to the lapse in coverage for Property insurance, CBRE Loan Services, Inc., has purchased coverage effective 06/22/2023 to 07/31/2023. Please be advised that the force-placed coverage obtained only protects the interest of the lender and may not equal the replacement cost of the property. You were not named beneficiary of the policy. Insurance proceeds are payable to CBRE Loan Services, Inc., as servicer for The Bancorp Bank, it's successors and/or assigns, as their interests may appear.

42.     DeRowe's direction for Bancorp to pursue a policy that is even more unreasonable than the ones Plaintiffs had identified calls into question whether he, or Bancorp, is receiving some type of kickback for the policy arrangement. Particularly, Greg Braciak, a Director at Bancorp, informed Plaintiffs that so long as insurance for the total insurable amount was not placed on the property, force placed coverage through "our servicer" would be placed just *one day* before the force placed coverage was put on the property. Despite Plaintiffs' months of searching for policies in full compliance with the original terms of the Loan Agreement and discussions with Bancorp of feasible alternatives that would allow the property to be well-protected and operable, Bancorp arbitrarily chose to accept *more expensive* coverage from its own servicer, likely for *less protection* than the total insurable interest in the Del Mar Apartments property.

43.     Additionally, by failing to disclose any meaningful information about the unreasonable policy, Plaintiffs are unable to determine what coverage they have for their property, including but not limited to whether the force placed coverage covers all aspects contemplated in Section 8.1 of the Loan Agreement and whether the insurance costs are bona fide and reasonable under 12 C.F.R. § 1024.37(h).

44.     This force placed coverage frustrates the fundamental purpose of the Loan Agreement, because the revenues from Del Mar are no longer enough to cover the costs of operating the property, the new insurance policy, and the debt service commitments to Bancorp.

**V.      Bancorp's Improper Use of Escrow Funds and Refusal to Provide Information**

45.      Under the plain terms of the Loan Agreement, Bancorp is required to pay for any force

placed coverage and then submit to Plaintiffs for reimbursement (Ex. 1 § 8.1.2):

> other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender.  If
> Borrower does not furnish such evidence and receipts at least ten (10) days prior to the expiration
> of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance
> and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of
> such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.
> Borrower shall deliver to Lender a certified copy of each Policy within ten (10) days after
> request by Lender.  Borrower shall promptly forward to Lender a copy of each written notice

46.      For example, Section 8.1.2 requires that the Lender (Bancorp) "pay the Insurance

Premium" if it chooses to force place coverage, and Borrower (Plaintiffs) "shall reimburse." This

language makes no sense if Bancorp could simply deduct Escrow Funds to cover a force placed

premium. Further, if Bancorp could use the Tax and Insurance Escrow Funds, no interest would

ever accrue, thus there would be no need to provide for "interest accruing at the Default Rate."

47.      Despite this, DeRowe stated that Bancorp would ignore the plain terms of the Loan

Agreement and deduct from Plaintiffs' Tax and Insurance Escrow Account to pay for the

unreasonable force placed premiums.

48.      After Plaintiffs objected to Bancorp's use of any of Plaintiffs' funds to cover the

unreasonable force placed funds, DeRowe followed through and Bancorp did it anyway.

49.      Bancorp has continued to draw from Plaintiffs' Tax and Insurance Escrow Funds to

cover the unreasonable, arbitrary, and still unidentifiable force placed premiums. Further, Bancorp

has withdrawn funds not only from the Insurance portion of Plaintiffs' Escrow Account, but also

have now drawn down Plaintiffs' Escrow Funds *set aside for taxes*. The table below illustrates

Bancorp's use of funds from the Tax subaccount to pay for the unreasonable and arbitrary forced

place coverage.

| | | | | | | | CBRE Loan Services, Inc. | | |
| | | | | | | | Transaction History | | |
| | | | | | | | Loan No: 010952586 | | |
| | | | | | | | DEL MAR TIC I, LLC ET AL | | |
| | | | | | | | Transactions from: 01/01/2023 to 10/27/2023 | | |

2023-10-27

| Transaction Date | Effective Date | Description | Paid for Date | Amount Paid | Principal | Interest | MIP | Re Tax | Insurance | Reserve |
|---|---|---|---|---|---|---|---|---|---|---|
| -------- | -------- | Beginning Balance | | | | | $0.00 | $888,736.54 | $121,311.24 | $773,021.82 |
| 06/26/2023 | 04/10/2023 | PAYMENT REVERSED | 04/10/2023 | ($1,154,900.76) | ($1,154,900.76) | | $0.00 | $888,736.54 | $346,211.84 | $773,554.82 |
| 06/26/2023 | 04/10/2023 | LOAN ADVANCE REVERSAL | | ($1,154,900.76) | ($1,154,900.76) | | $0.00 | $0.00 | $0.00 | $0.00 |
| 06/26/2023 | 04/03/2023 | LOAN ADVANCE | | $1,154,900.76 | $1,154,900.76 | | $0.00 | $0.00 | $0.00 | $0.00 |
| 06/29/2023 | 06/29/2023 | INSURANCE DISBURSEMENT | 07/01/2023 | ($249,020.39) | $0.00 | $0.00 | $0.00 | $0.00 | ($249,020.39) | $0.00 |
| 07/03/2023 | 07/03/2023 | INT ON ESCROW CREDIT | | $148.55 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $148.55 |
| 07/03/2023 | 07/03/2023 | INT ON ESCROW CREDIT | | $319.28 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $319.28 |
| 07/10/2023 | 07/10/2023 | PAYMENT RECEIVED | 07/09/2023 | $450,100.55 | $0.00 | $316,429.55 | $0.00 | $67,605.34 | $38,511.83 | $27,553.83 |
| 08/01/2023 | 08/01/2023 | INT ON ESCROW CREDIT | | $173.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $173.00 |
| 08/01/2023 | 08/01/2023 | INT ON ESCROW CREDIT | | $340.89 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $340.89 |
| 08/07/2023 | 08/09/2023 | LOAN ADVANCE | | $817,735.96 | $817,735.96 | | $0.00 | $0.00 | $0.00 | $0.00 |
| 08/09/2023 | 08/09/2023 | PAYMENT RECEIVED | 08/09/2023 | $459,932.44 | $0.00 | $326,261.44 | $0.00 | $67,605.34 | $38,511.83 | $27,553.83 |
| 08/21/2023 | 08/21/2023 | R.E. TAX DEBIT | 08/01/2023 | ($23,592.49) | $0.00 | $0.00 | $0.00 | ($23,592.49) | $0.00 | $0.00 |
| 08/21/2023 | 08/21/2023 | INSURANCE CREDIT | 08/01/2023 | $23,592.49 | $0.00 | $0.00 | $0.00 | $23,592.49 | $0.00 | $0.00 |
| 08/21/2023 | 08/21/2023 | INSURANCE DISBURSEMENT | 08/01/2023 | ($192,161.61) | $0.00 | $0.00 | $0.00 | $0.00 | ($192,161.61) | $0.00 |
| 09/01/2023 | 09/01/2023 | INT ON ESCROW CREDIT | | $185.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $185.33 |
| 09/01/2023 | 09/01/2023 | INT ON ESCROW CREDIT | | $335.67 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $335.67 |
| 09/11/2023 | 09/11/2023 | PAYMENT RECEIVED | 09/09/2023 | $468,198.31 | $0.00 | $334,527.31 | $0.00 | $67,605.34 | $38,511.83 | $27,553.83 |
| 09/22/2023 | 09/22/2023 | R.E. TAX DEBIT | 09/01/2023 | ($153,649.78) | $0.00 | $0.00 | $0.00 | ($153,649.78) | $0.00 | $0.00 |
| 09/22/2023 | 09/22/2023 | INSURANCE CREDIT | 09/01/2023 | $153,649.78 | $0.00 | $0.00 | $0.00 | $0.00 | $153,649.78 | $0.00 |
| 09/22/2023 | 09/22/2023 | INSURANCE DISBURSEMENT | 09/01/2023 | ($192,161.61) | $0.00 | $0.00 | $0.00 | $0.00 | ($192,161.61) | $0.00 |
| 10/02/2023 | 09/28/2023 | LOAN ADVANCE | | $409,998.28 | $409,998.28 | | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/02/2023 | 10/02/2023 | INT ON ESCROW CREDIT | | $201.74 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $201.74 |
| 10/02/2023 | 10/02/2023 | INT ON ESCROW CREDIT | | $340.74 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $340.74 |
| 10/10/2023 | 10/10/2023 | PAYMENT RECEIVED | 10/09/2023 | $462,699.74 | $0.00 | $329,028.74 | $0.00 | $67,605.34 | $38,511.83 | $27,553.83 |
| 10/24/2023 | 10/24/2023 | RE TAX ESCROW PAYMENT | | $177,242.27 | $0.00 | $0.00 | $0.00 | $177,242.27 | $0.00 | $0.00 |
| 10/26/2023 | 10/26/2023 | INSURANCE DISBURSEMENT | 10/01/2023 | ($38,511.83) | $0.00 | $0.00 | $0.00 | $0.00 | ($38,511.83) | $0.00 |
| -------- | -------- | Ending Balance | | | | | $0.00 | $788,809.30 | | $1,052,705.05 |

| | \*\*\*\*\*\*\*\*\*YEAR TO DATE AMOUNTS\*\*\*\*\*\*\*\*\* | | |
|---|---|---|---|
| PRINCIPAL | $1,154,900.76 | INTEREST | 2,959,749.58 |
| INSURANCE | $671,855.44 | LATE CHARGE | $0.00 |
| INT ON ESCROW | $4,144.93 | R.E. TAXES | $795,348.76 |

50.     Plaintiffs' tax reserves have now been lowered, all while additional principal and interest accrues to pay for the unreasonable and unknown force placed insurance.

51.     All the while, Bancorp continues to refuse to provide complete information about its "proprietary" insurance coverage. Bancorp's unwillingness to provide basic policy information raises suspicions about the reasonableness and arbitrariness of the force placed coverage.

## COUNT I – DECLARATORY JUDGMENT

52.      Plaintiffs incorporate by reference all allegations made in all foregoing paragraphs of this Complaint.

53.     A present, actual, and justiciable controversy exists between Plaintiffs and Defendant regarding whether Plaintiffs are bound to Defendant's unreasonable and arbitrary force placed premium and whether total replacement cost insurance contemplated in the loan agreement

is impracticable due to uncontrollable and unforeseen changes in the insurance market. 28 U.S.C. § 2201.

54. Accordingly, Plaintiffs seek a declaration that:

    a. Plaintiffs have no obligation to pay for the force placed premium for the unreasonable property insurance unilaterally purchased by Bancorp in an abuse of its discretion under the Loan Agreement;

    b. Bancorp has acted in a commercially unreasonable manner and in violation of the implied covenant of good faith and fair dealing;

    c. In light of the uncontrollable and unforeseen changes in the insurance market, it would be impracticable to allow Bancorp to force place coverage at unreasonable premium levels;

    d. In light of the uncontrollable and unforeseen changes in the insurance market, it would be impracticable to require Plaintiffs to obtain property insurance up to the total replacement value.

## COUNT II – BREACH OF FIDUCIARY DUTY

55. Plaintiffs incorporate by reference all allegations made in the foregoing paragraphs of this Complaint.

56. The Defendant's ability to unilaterally choose the force placed premium for Plaintiffs' property insurance gave the Defendant an unusual advantage and the Defendant assumed full responsibility and control for these premiums outside the terms provided for in the Loan Agreement without requesting any permission from Plaintiffs or explaining any terms of the force placed coverage.

57. The force placed premiums are unnecessary and excessive.

58.     Additionally, the unusually round nature of the insurance premiums, together with Bancorp's unwavering refusal to identify the name of the carrier or any terms of the policy itself, suggest that Bancorp may be benefitting from a kickback from its insurance servicer that is unascertainable without providing Plaintiffs access to the policy or, even worse, that Bancorp is collecting force placed premiums while not placing a policy at all.

59.     As an escrow holder, Defendant breached its fiduciary duty to Plaintiffs to properly manage the escrow funds by knowingly paying out the unreasonable and excessive force placed premiums from Plaintiffs' Escrow account without Plaintiffs' consent.

60.     Defendant further breached its duty by using funds from Plaintiff's Tax subaccount within the Escrow Funds and adding additional principal to the Loan to pay for the unreasonable, unnecessary, and arbitrary insurance coverage.

61.     Defendant's actions have damaged Plaintiffs, including but not limited to the use of funds in Plaintiffs' escrow account to pay out the unreasonable and excessive force placed premiums.

62.     Plaintiffs seek all available relief to be made whole from Defendant's actions.

**COUNT III – BREACH OF CONTRACT: IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

63.     Plaintiffs incorporate by reference all allegations made in the foregoing paragraphs of this Complaint.

64.     The Loan Agreement is a valid, enforceable contract between Plaintiffs and Defendant. Plaintiffs are proper parties to bring suit under the Loan Agreement.

65.     Plaintiffs have complied with all material terms of the Loan Agreement.

66.     New York law governs the Loan Agreement, and thus the Loan Agreement implicitly includes a covenant of good faith and fair dealing.

67.     Defendant's unreasonable and excessive force placed premium destroys Plaintiffs' rights to receive the fruits of the Loan Agreement because the premiums exceed the total operating income of the Del Mar Apartments, which completely wipes out Plaintiffs' profits from the property that the procured insurance is meant to protect.

68.     Further, the force placed premium injures Plaintiffs because Defendant has not made the policy available to Plaintiffs, effectively depriving Plaintiffs of the ability to make claims and examine their own policy as the insured.

69.     Additionally, the unusually round nature of the insurance premiums, together with Bancorp's unwavering refusal to identify the name of the carrier or any terms of the policy itself, suggest that Bancorp may be benefitting from a kickback from its insurance servicer that is unascertainable without providing Plaintiffs access to the policy or, even worse, that Bancorp is collecting force placed premiums while not placing a policy at all. This is necessarily an abuse of Bancorp's discretion under the Loan Agreement.

70.     Defendant's dealings with other affected borrowers to waive aspects of their insurance requirements demonstrates that Bancorp's decision to force place coverage on Plaintiffs' loan was arbitrary, unreasonable, and an abuse of its discretion under the Loan Agreement.

71.     As an agent of Defendant, Olek DeRowe's refusal to negotiate practicable insurance terms with Plaintiffs and subsequent adoption of force placed coverage at an unreasonably high and arbitrary rate allows for Defendant to benefit from its unilaterally chosen policy and hide it away from Plaintiffs.

72.     As a result, Defendant's actions related to the unreasonable force placed premium amount to a material breach of the implied covenant of good faith and fair dealing with respect to the Loan Agreement.

73. Defendant's actions have damaged Plaintiffs, including but not limited to the amounts improperly deducted from the Escrow Account, and the continuing $193,000 premium under Defendant's unknown and unilaterally chosen insurance policy.

74. Plaintiffs seek all available relief to be made whole from Defendant's actions.

**COUNT IV – BREACH OF CONTRACT: ESCROW ACCOUNT**

75. Plaintiffs incorporate by reference all allegations made in the foregoing paragraphs of this Complaint.

76. The Loan Agreement is a valid, enforceable contract between Plaintiffs and Defendant. Plaintiffs are proper parties to bring suit under the Loan Agreement.

77. Plaintiffs have complied with all material terms of the Loan Agreement.

78. Defendant breached the Loan Agreement by using Escrow Funds in a manner that is not authorized under the Loan Agreement.

79. Defendant further breached the Loan Agreement by using funds from Plaintiffs' Tax subaccount within the Escrow Funds and adding additional principal to the Loan to pay for the unreasonable, unnecessary, and arbitrary insurance coverage.

80. Additionally, the unusually round nature of the insurance premiums, together with Bancorp's unwavering refusal to identify the name of the carrier or any terms of the policy itself, suggest that Bancorp may be benefitting from a kickback from its insurance servicer that is unascertainable without providing Plaintiffs access to the policy or, even worse, that Bancorp is collecting force placed premiums while not placing a policy at all. The Loan Agreement, of course, does not contemplate the use of Escrow Funds for these purposes.

81. Defendant's actions have damaged Plaintiffs in the amounts improperly deducted from the Escrow Account.

82. Plaintiffs seek all available relief to be made whole from Defendant's actions.

## PRAYER FOR RELIEF

83.    Wherefore, Plaintiffs pray for a judgment as follows:

1.  For an injunction restraining and enjoining the Defendant, their agents, employees, and all other persons acting in concert or participating with them:

    a.  From force placing insurance coverage without providing the Del Mar entities the complete policy information for the chosen coverage;

    b.  From using monies from the Del Mar Entities' Tax and Insurance Escrow Subaccount to pay for forced placed coverage;

    c.  From using monies specifically from the Del Mar Entities' tax reserve in the Tax and Insurance Escrow Subaccount to pay for forced placed coverage.

    d.  From seeking reimbursement for force placed insurance that is deemed to be unreasonable, excessive, and arbitrary;

    e.  From arbitrarily force placing insurance on the Del Mar Apartments in light of Bancorp's actions with other borrowers.

2.  For a declaration that:

    a.  Plaintiffs have no obligation to pay for the force placed premium for the unreasonable property insurance unilaterally purchased by Bancorp;

    b.  Bancorp has acted in a commercially unreasonable manner and in violation of the implied covenant of good faith and fair dealing;

    c.  In light of the uncontrollable and unforeseen changes in the insurance market, it would be impracticable to allow Bancorp to force place coverage at unreasonable premium levels; and

d.  In light of the uncontrollable and unforeseen changes in the insurance market, it would be impracticable to require Plaintiffs to obtain property insurance up to the total replacement value.

3.  And for such judgment to be entered against Defendant granting compensatory damages, punitive damages, and such further relief as the Court may deem proper.

Dated: November 29, 2023

By:    /s/ *Jason S. McManis*
Jason S. McManis (*pro hac vice*)
Texas Bar No. 24088032
Angela M. Peterson (*pro hac vice*)
Texas Bar No. 24137111
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
T: 713-655-1101
F: 713-655-0062
jmcmanis@azalaw.com
apeterson@azalaw.com

Russell M. Yankwitt
Jonathan Ohring
**YANKWITT LLP**
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
Fax: (914) 487-5000
russell@yankwitt.com
jonathan@yankwitt.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the within and foregoing Plaintiffs' First Amended Complaint by CM/ECF upon all counsel of record.


Dated: November 29, 2023

By:    /s/ *Jason S. McManis*
Jason S. McManis (*pro hac vice*)
Texas Bar No. 24088032
Angela M. Peterson (*pro hac vice*)
Texas Bar No. 24137111
**AHMAD, ZAVITSANOS, & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
T: 713-655-1101
F: 713-655-0062
jmcmanis@azalaw.com
apeterson@azalaw.com

Russell M. Yankwitt
Jonathan Ohring
**YANKWITT LLP**
140 Grand Street, Suite 705
White Plains, New York 10601
Tel: (914) 686-1500
Fax: (914) 487-5000
russell@yankwitt.com
jonathan@yankwitt.com